

ARCCA, INCORPORATED
2288 SECOND STREET PIKE
P.O. BOX 78
PENNS PARK, PA 18943
**PHONE** 215-598-9750 **FAX** 215-598-9751
www.arcca.com

December 15, 2021

Brian S. Katz, Esquire
Katz Law Firm
2226 Broadway, Suite 1
P.O. Box 2903
Paducah, KY 42002-2903

    Re:  *Moore, Jerry Ralph Jr. v. Pine Bluff Materials Company, LLC and Pine Bluff Sand & Gravel Company*
          ARCCA File No.: 5868-001

Dear Mr. Katz:

Thank you for the opportunity to participate in the above-referenced matter. Your firm retained ARCCA, Incorporated to perform an analysis of the subject incident in relation to Mr. Jerry Moore. This analysis is based on information currently available to ARCCA and is only to be issued in its entirety. However, ARCCA reserves the right to supplement or revise this information if additional material becomes available.

The opinions given are based on my analysis of the available materials using scientific and engineering methodologies generally accepted in the scientific community. These opinions are also based on my education, experience, background, and knowledge of biomechanics, safety, human factors and kinematics, and human injury mechanisms and tolerance. I am presently employed as a Senior Biomechanist for an engineering firm known as ARCCA, Inc. I obtained a Doctor of Philosophy degree in Industrial and Systems Engineering, Human Factors Option from Virginia Tech and a Master of Science degree in Industrial and Systems Engineering, with an emphasis in Safety Engineering from Virginia Tech. I also received a Master of Science degree in Mathematics from Virginia Tech and a Bachelor of Arts in Mathematics from the University of Connecticut. I have completed advanced coursework in the fields of musculoskeletal biomechanics, human factors, safety, kinesiology, physiology, ergonomics, occupational biomechanics, and impact biomechanics. I am a Certified Professional Ergonomist (CPE) and a member of the American Society of Biomechanics, American Society of Safety Professionals, Human Factors and Ergonomics Society, ASTM International F13 Committee on Pedestrian/Walkway Safety, and IEA Slips, Trips and Falls Committee. I maintain an OSHA 30-Hour Outreach Training for the Construction Industry Certification, an OSHA Fall Protection for the Competent Person Certification, an OSHA Scaffolding Safety for the Competent Person Certification, an OSHA 10-Hour Outreach Training Program – General Industry Certification, an OSHA Industrial Truck Operator Certification, an NYC DOB 4-Hour Supported Scaffolding User Certification, an NYC DOB 32-Hour Supported Scaffold Installer/Remover Certification and NYC DOB 8-Hour Site Safety Coordinator Training. I was a National Academies member of the Committee on Review of the NIOSH Construction Research Program, NIOSH 2019 Study Section Grant Reviewer, and in 2011 was designated as one of "100 Women Making a Difference in the Safety, Health and Environmental Profession" by ASSE's Women in Safety Engineering.

Brian S. Katz, Esq.
December 15, 2021
Page 2



While at Virginia Tech, I taught courses to both undergraduate and graduate students related to Human Factors Engineering, Industrial Engineering, and Occupational Biomechanics. I performed experimental three-dimensional motion analyses, as well as extensive kinematic and kinetic studies of the human body. My testing and research have been performed with human subjects. These tests and research studies have added to my formal education in biomechanics and injury causation. As such, I am very familiar with the theory and application of human tolerance to the areas of slip, trip, and fall incidents and ergonomics, as well as the techniques and processes for evaluating mechanisms of injury using scientifically accepted techniques to assess the potential for injury during a particular incident.

Upon graduating from Virginia Tech, I worked for approximately 10 years at the Liberty Mutual Research Institute for Safety in Hopkinton, Massachusetts. During my tenure at Liberty Mutual, I completed multiple research projects that examined the mechanisms of balance control on level and elevated surfaces, including slips and falls and working on ladders. This included the influence of individual, task, and environmental factors. Completion of these projects required knowledge, use, and application of ANSI and ASTM standards to accurately translate real-world situations to laboratory scenarios and apply laboratory findings to real-world circumstances and conditions. Motivation for the research projects was partially derived from the construction industry and integrated site visits and consultations with field representatives.

I also have extensive experience related to distracted walking, assessment of physical and mental workload, and effects of dual-tasking on performance. I have published in the areas of postural control, gait analysis, occupational biomechanics, and human factors and ergonomics and have given multiple technical presentations at domestic and international scientific conferences. While at ARCCA, I continue to conduct technical lectures dealing with the causation and prevention of injury trauma.

**Background and Incident Description:**

According to the materials reviewed, on July 10, 2017, at approximately 8:00 a.m., Mr. Jerry Moore, a 59-year-old man at the time, was injured when he fell from the fine sand conveyor located on the Dredge Pine Bluff to the deck below. [Figure 1] Mr. Moore, an employee of Pine Bluff Materials, was a pump operator on the Dredge Pine Bluff and a shipyard competent person. Based on the Pine Bluff Materials Incident Report, Terry Smith and Justin Reed were in the process of replacing an old bearing on the fine sand conveyor when they heard Jerry Moore hit the deck next to the conveyor. Based on Deaconess Health System records dated July 10, 2017, Jerry Moore was 70 inches in height, and weighed approximately 251 pounds at the time of the subject incident.

Brian S. Katz, Esq.
December 15, 2021
Page 3





Figure 1. Dredge Pine Bluff. [Photograph taken at ARCCA inspection]

**Materials Reviewed:**

As part of my analysis in this matter, I reviewed numerous documentary materials, including, but not limited to, the following:

- Pine Bluff Materials Incident Reporting Form, dated July 12, 2017
- Mine Safety and Health Administration Preliminary Report of Accident dated July 10, 2017
- Complaint
- Answer of Pine Bluff Materials Co., LLC and Pine Bluff Sand & Gravel Company
- Plaintiffs' Answers to Pine Bluff Materials Co., LLC and Pine Bluff Sand & Gravel Company's First Set of Interrogatories to Plaintiff
- Plaintiffs' Response to Pine Bluff Materials Co., LLC and Pine Bluff Sand & Gravel Company's Request for Production of Documents to Plaintiff
- Plaintiff's First Set of Request for Admissions and Fourth Set of Interrogatories to Defendant, Pine Bluff Materials Co, LLC
- Responses to Plaintiff's First Set of Request for Admissions and Fourth Set of Interrogatories to Defendant, Pine Bluff Materials Co, LLC
- Deposition Transcripts of Jerry Moore taken on September 23, 2021 and September 24, 2021
- Deposition Transcript of Terry Smith taken on January 20, 2021
- Deposition Transcript of Justin Reed taken on January 20, 2021
- Deposition Transcript of Darryl McDonald taken January 19, 2021
- Deposition Transcript of Gene Whalen taken on November 8, 2021

Brian S. Katz, Esq.
December 15, 2021
Page 4



- Deposition Transcript of Andy Grant taken on October 8, 2021
- Deposition Transcript of Bryan Henley taken on April 1, 2021
- Deposition Transcript of Bryan Lanham taken on July 28, 2021
- Deposition Transcript of Casey Shultz taken on August 6, 2021
- Deposition Transcript of Colby Cooper taken on July 29, 2021
- Deposition Transcript of Dennis Moscoe taken on July 28, 2021
- Deposition Transcript of Denver Edmonds taken on July 29, 2021
- Deposition Transcript of Donald Lewis taken on July 30, 2021
- Deposition Transcript of Duran McDonald taken on October 15, 2021
- Deposition Transcript of Gary Jones taken on July 28, 2021
- Deposition Transcript of Gary Duncan taken on April 1, 2021
- Deposition Transcript of Howard Johnson taken on October 8, 2021
- Deposition Transcript of Hunter Orenduff taken on July 30, 3021
- Deposition Transcript of Jesse Canada taken on October 15, 2021
- Deposition Transcript of John Suggs taken on April 1, 2021
- Deposition Transcript of Kevin Barnes taken on July 29, 2021
- Deposition Transcript of Nicholas Hurley taken on July 30, 2021
- Deposition Transcript of Ricky Hensley taken on July 29, 2021
- Deposition Exhibits
- Color reproductions of photographs of the subject location
- Color reproduction of a photograph of the plaintiff
- Medical Records pertaining to Jerry Moore
- ARCCA Site Inspection conducted on August 26, 2021
- Publicly available literature, including, but not limited to, the documents cited within the report, learned treatises, textbooks, and scientific standards.

**Findings and Deposition Testimony:**

The Dredge Pine Bluff utilizes two conveyors that are located on the deck. The fine sand conveyor was on the starboard side [Figure 2] and the coarse sand conveyor was on the port side. On the morning of the subject incident, Mr. Jerry Moore, Mr. Justin Reed, Mr. Terry Smith, Mr. Jeff York, Mr. Darryl McDonald, and Mr. Hunter Orenduff, all employees of Pine Bluff Materials, were on the Dredge Pine Bluff performing maintenance tasks. Mr. Moore was the senior crew member on the dredge and was supervising and helping the two crews. At the time of the subject incident, Mr. Smith and Mr. Reed were in the process of replacing a bearing on the fine sand conveyor. [Figure 3] Based on the Pine Bluff Materials incident report, the bearing being accessed by Mr. Smith and Mr. Reed was approximately 9 feet above the deck. Based on the materials reviewed, the two men were utilizing

Brian S. Katz, Esq.
December 15, 2021
Page 5



a 6-ft stepladder, a come-along, a chain, and a pry bar to complete the work. Mr. York, Mr. McDonald, and Mr. Orenduff were performing maintenance on the coarse sand conveyor, although at the time of the subject incident, Mr. McDonald testified to being in the tool room.



**Figure 2. Fine sand conveyor on the starboard side of the Dredge Pine Bluff. [Exhibit 17]**



**Figure 3. Location of bearing that was being replaced on the fine sand conveyor. [Exhibit 24]**

Brian S. Katz, Esq.
December 15, 2021
Page 6



According to the Mine Safety and Health Administration Preliminary Report of Accident, foot prints were observed on top of the fine sand conveyor going to the area where the bearing was being replaced, although no one observed Mr. Moore climb onto the conveyor. [Figure 4] Based on the Pine Bluff Materials incident report, no tools or equipment were found that Mr. Moore may have been carrying. It was estimated in the Pine Bluff Materials incident report that Mr. Moore fell approximately 11 – 13 feet from atop the conveyor belt, with exact height dependent upon his exact pre-fall location on the conveyor belt. [Figure 5]



**Figure 4. Footprints in the sand on the fine sand conveyor after the subject incident.**



**Figure 5. Assumed pre-fall location as indicated in Pine Bluff Materials Incident Report.**



Mr. Moore testified that at the time of the subject incident, he was supervising both of the crews on the dredge that were performing maintenance tasks on the fine and coarse sand conveyors. Mr. Moore testified that after checking on the work being performed by Mr. Smith and Mr. Reed, it was determined that a new shaft was needed, so he called Mr. Howard Johnson. According to Mr. Moore, while waiting to hear from Mr. Johnson, he went to the coarse sand conveyor on the port side to check on the progress being made. Mr. Moore testified that the last thing he remembers is walking back towards the fine sand conveyor near the back end of the sand screws and seeing Mr. Smith and Mr. Reed. Mr. Moore further testified that in the past he would crawl on the conveyor to access the higher area of the conveyor and that although he would hold onto the chain for support if needed, he would not lean his body weight against the chain.

Mr. Smith testified that although he saw Mr. Moore talking on the phone and walking around the conveyors, he did not see him again before the fall. Mr. Reed also testified that he did not see Mr. Moore on the conveyor and did not see him fall. According to Mr. Reed, Mr. Moore was wearing his hard hat the last time he saw him and was not carrying anything else.

Mr. Reed testified that he was standing on the third step of a 6-ft stepladder while working on the bearing and that Mr. Smith was on his right side using a pry bar while standing on the deck. Mr. Reed further testified that he was not underneath the conveyor, but had placed the ladder parallel with the conveyor. Mr. Reed testified that if Mr. Moore was standing on the conveyor above where they were working, his feet would have been approximately 18-24 inches above Mr. Reed's eyes.

Mr. Smith testified that while he was working with Mr. Reed on the bearing of the fine sand conveyor, he heard Mr. Moore yell "watch out" and then the handrail post and/or chain struck his hard hat and caused him to fall against Mr. Reed. Mr. Reed testified that the post hit him on the right side of his hard hat, but it did not knock him off of the ladder. The post and chain had been part of the handrail on top of the conveyor. Mr. Smith testified that the post and chain that had fallen would have been parallel to the one across from it on the frame of the conveyor with the posts being aligned with each other. [Figure 6] Mr. Smith testified that the post was approximately 1 inch around and constructed of solid cold rolled steel. Mr. Moore testified that the posts were approximately 3 feet long and the chain came up to the top of his belt. This is consistent with a dimensional analysis that evaluated the total length of the post in Figure 6 as approximately 38 inches.

Brian S. Katz, Esq.
December 15, 2021
Page 8

Brian S. Katz, Esq.
December 15, 2021
Page 8





**Figure 6. Post and chain from handrail that fell and struck Mr. Reed and Mr. Smith. [Exhibit 17]**

Mr. Reed testified that after being struck by the post, he looked over his left shoulder and saw Mr. Moore laying on the deck. Mr. Reed and Mr. Smith both testified that Mr. Moore was on his stomach with his head near the kevel. [Figure 7] Mr. Reed testified that at least one of Mr. Moore's arms was hanging over the edge of the deck. Mr. Moore's hard hat was on the deck after the fall and blood was observed in the yellow paint on the edge of the dredge. [Figure 8] Mr. Reed testified that he observed hair on the edge of the adjacent sand barge, which was approximately one foot away and 2-3 feet above the deck. Mr. Smith testified that Mr. Moore's radio microphone was stuck on the conveyor after the fall. [Figure 9] Mr. Moore's microphone had been attached to his life vest and positioned on his upper left chest prior to the fall.[1]

---

[1] Mr. Moore illustrated the position of his radio microphone in a photograph.

Brian S. Katz, Esq.
December 15, 2021
Page 9





**Figure 7. Stick figure positioned on deck where Plaintiff was laying after fall.**



**Figure 8. Plaintiff's blood near the kevel.**





**Figure 9. Plaintiff's radio microphone on top of conveyor after fall.**

As part of my investigation, on August 26, 2021, I conducted a site inspection of the Dredge Pine Bluff, particularly the fine sand conveyor on the starboard side. In addition to my observations and measurements, a Faro Focus Laser Scanner was used to take three-dimensional laser scans of the fine sand conveyor and surrounding areas of the deck. It was noted that changes had been made to the fine sand conveyor, but that it was substantially similar to the one that existed at the time of the subject incident. [Figure 10] Of particular note, the post and chain system had been replaced by a wire railing system.



**Figure 10. Fine sand conveyor on the Dredge Pine Bluff [Photograph taken at ARCCA inspection]**



The fine sand conveyor was housed within a steel frame that was, in part, supported by vertical steel beams. The slope of the steel frame was approximately 13 degrees. The set of two vertical steel beams closest to the starboard edge of the deck were positioned approximately 58 inches from the edge. The width of the steel frame was 55 ¼ inches. The height of the vertical beams closest to the starboard edge of the deck, and thus the adjacent bearing, was 113 inches (9 feet 5 inches). The height of the steel frame aligned with the vertical beam closest to the edge of the deck was approximately 132 inches (11 feet). The total length of the conveyor was 687 inches (57 feet 3 inches). The width of the conveyor was 30 ½ inches and the depth was 5 inches. The edge of the conveyor was approximately 10 ¼ inches above the top of the steel frame. The rollers underneath the conveyor were approximately 48 inches apart. The kevel nearest to the fine sand conveyor [see Figure 8] was approximately 11 inches from the edge of the deck, 9 inches wide, and offset from the vertical steel beams for approximately 5 feet 3 inches.

**Analysis and Discussion:**

My analysis in this matter consisted of a kinematics evaluation of Mr. Jerry Moore's fall incident to investigate the causative nature of the post and chain located on the fine sand conveyor. In doing so, my analysis considered the facts of the case regarding Mr. Moore's incident in the context of the laws of physics, fundamental principles of human movement biomechanics, human factors and the methodology for scientific inquiry.[2,3,4,5,6] More specifically, the kinematic analysis entailed applying principles of physics and geometry to assess various scenarios to rule them in or out in accordance with a proper scientific methodology. This analysis included using 3D models based on materials reviewed including data obtained by the Faro Focus Laser Scanner, photographs post incident, deposition testimony, my dredge inspection, and a photograph taken of Mr. Moore demonstrating the position of his radio and microphone on his life vest prior to his fall.

The collective testimony regarding Mr. Moore's fall indicated that he sustained injuries when he fell from the fine sand conveyor to the deck below, while his coworkers were replacing an old bearing that was located underneath the conveyor. Prior to the subject incident, a chain was located on each side of the steel frame of the fine sand conveyor at a height of approximately 36 inches. This height was testified to by Mr. Moore and a dimensional analysis confirmed the approximate height. At a height of approximately 36 inches, the chain would have been positioned at approximately waist height on Mr. Moore while he was standing on the conveyor.[7,8] The chains were parallel to each other and supported by steel posts located at regular intervals along each side of the conveyor on the steel frame with one post higher up on the conveyor from the bearing being replaced and one below. The posts supporting each chain were aligned with each other on each side of the conveyor. Based on the materials reviewed, the post and chain on the stern side of the dredge was initially stable prior to the subject incident. Based on Newton's First Law of Motion, the steel post would not become disconnected from the frame without an external force being applied to it.[9] Based on the materials reviewed, the first post on the lower end of the conveyor became disconnected from its original position on the steel frame and fell, causing the chain that was attached to it to fall also and swing

---

[2] Halliday, D., Resnick, R., Walker, J. (2003). <u>Fundamentals of Physics</u>. New York, John Wiley & Sons, Inc.
[3] Nordin, M. and Frankel, V. H. (2012). <u>Basic Biomechanics of the Musculoskeletal System. Third Edition</u>. Lippincott Williams & Wilkins, Philadelphia, Pennsylvania.
[4] Sanders, M.S. and McCormick, E.J. (1993). <u>Human factors in engineering and design: Seventh edition</u>, McGraw-Hill, NY.
[5] Winter, D.A. (1990). <u>Biomechanics and motor control of human movement</u>. John Wiley & Sons, Inc. New York, NY.
[6] Carey, S.S. (2004). <u>A Beginner's Guide to Scientific Method</u>. Belmont, CA: Wadsworth.
[7] Gordon, C.C., et al. (2014). 2012 Anthropometric Survey of U.S. Army Personnel: Methods and Summary Statistics. U.S. Army Natick Soldier Research, Development and Engineering Center: Natick, MA.
[8] Chaffin, D.B., et al. (1999). Occupational Biomechanics. New York, NY: John Wiley & Sons, Inc.
[9] Halliday, D., Resnick, R., Walker, J. (2003). <u>Fundamentals of Physics</u>. New York, John Wiley & Sons, Inc.



towards the starboard edge of the deck. [See Figure 6] There is no evidence that anyone was on the fine sand conveyor with Mr. Moore, thus, the force applied to the post and chain that caused it to fail had to have been exerted only by Mr. Moore as he interacted with the chain.

Mr. Moore does not recall the events immediately prior to his fall. Furthermore, there were no witnesses to the fall, although several coworkers came to the scene after the fall and made observations of Mr. Moore after his fall. Thus, it is not clear exactly what he was doing immediately prior to his fall but based on the materials reviewed it is likely that his being on the fine sand conveyor was related to the work being performed on the bearing. It is known that Mr. Moore's radio microphone became detached from his life vest and was positioned on the steel frame of the fine sand conveyor near the subject bearing after the subject incident. [See Figure 9] In addition, after Mr. Moore fell from the top of the fine sand conveyor, he was face down on the starboard side of the dredge with his head extended past the edge of the deck towards the adjacent sand barge. In order for Mr. Moore's microphone to become detached from his life vest and end up on the steel frame of the conveyor where it was located after the fall, the microphone and/or microphone cord would have to have contacted a component of the fine sand conveyor such that a sufficient force was applied by the conveyor to the microphone and/or cord, causing it to detach from the life vest. Given that the microphone was positioned on Mr. Moore's upper left chest, Mr. Moore's upper left chest would have needed to also be in the vicinity of the fine sand conveyor during this interaction. As mentioned, Mr. Moore does not remember the actual incident, but did testify that when he was moving up the conveyor he often would do so by keeping his body low and would not lean his body weight on the chain.

A human factors analysis was conducted that analyzed multiple scenarios regarding Mr. Moore's general pre-fall position. The most likely scenarios considered included Mr. Moore initially standing on the conveyor and Mr. Moore kneeling on the conveyor (i.e. center of mass closer to conveyor). Again, as previously discussed, the post and chain would not have broken or separated if not acted upon by a force. In addition, this force had to be from the middle line of the conveyor towards the outside edge.

The first scenario analyzed assumed that Mr. Moore was walking or standing on the conveyor when he lost his balance while on top of the fine sand conveyor. [Figure 11] In a standing position on the conveyor, Mr. Moore's center of mass would have been slightly above the height of the nearby chain at approximately 39.9 inches.[10] A loss of balance in a standing position towards the edge of the conveyor would have caused Mr. Moore to fall into the chain located along the steel frame. There is no evidence that there was an external force applied to Mr. Moore while standing on the conveyor besides the downward vertical force towards the deck applied by gravity. If the post attached to the chain became disconnected from the steel frame due to the force applied by Mr. Moore while falling off of the conveyor from an erect position, the trajectory of his center of mass would not have allowed his upper left chest, and thus, his radio microphone to be in the vicinity of the edge of the conveyor.[11,12,13,14] [Figure 12] Thus, a scenario in which Mr. Moore falls into the chain from a standing position, causing the post to disconnect from the steel frame, is inconsistent with the facts of the subject incident.

---

[10] Hay, J.G. and Reid, J.G. (1988). <ins>Anatomy, Mechanics, and Human Motion</ins>. Englewood Cliffs, NJ: Prentice Hall.
[11] Gordon, C.C., et al. (2014). 2012 Anthropometric Survey of U.S. Army Personnel: Methods and Summary Statistics. U.S. Army Natick Soldier Research, Development and Engineering Center: Natick, MA.
[12] Hsiao, E.T., Robinovitch, S.N. (1998). Common Protective Movements Govern Unexpected Falls from Standing Height. <ins>J. of Biomechanics</ins> 31: 1-9.
[13] Smeesters, C., et al. (2001). Disturbance type and gait speed affect fall direction and impact location. <ins>J of Biomechanics</ins>, 34: 309-317.
[14] Pavol, M.J. et al. (2001). Mechanism leading to a fall from an induced trip in healthy older adults. <ins>Journal of Gerontology, Medical Science</ins> 56A(7): M428-M437.

Brian S. Katz, Esq.
December 15, 2021
Page 13





**Figure 11. 3D model illustrating Plaintiff standing on the fine sand conveyor.**



(a)



(b)

**Figure 12. (a) Mr. Moore's microphone on his life vest relative to the location in which the radio microphone was found after the subject incident if he fell from a standing position. (b) Side view of fall from a standing position.**

Given that a fall into the chain from a standing posture is inconsistent with the facts of the subject incident, Mr. Moore had to be in a position in which his upper chest, and thus, center of mass, was located closer to the top of the conveyor, for example, in a kneeling posture. Note that kneeling was modeled and discussed for the second and third scenarios, but the analysis would apply to any similar posture in which Mr. Moore's center of mass was located below the height of the chain. It is reasonable that Mr. Moore was in a position on the fine sand conveyor that was near the subject bearing where work was being performed. As indicated above, there is no evidence that there was an external force applied to Mr. Moore while kneeling on the conveyor besides the downward vertical force

Brian S. Katz, Esq.
December 15, 2021
Page 14



towards the deck applied by gravity. In the second scenario examined, Mr. Moore became unsteady while in a kneeling posture on the conveyor and grabbed hold of the chain in an attempt to steady himself, but the chain falls when the post disconnects from the steel frame, causing the post, chain, and Mr. Moore to fall off of the conveyor. [Figures 13 and 14] The third scenario is similar, except that Mr. Moore is initially in a kneeling posture on the conveyor holding onto the chain for support when the post disconnects from the steel frame, causing the post, chain, and Mr. Moore to fall. Based on the location of the radio microphone on Mr. Moore's life vest prior to the fall[15], a fall from a kneeling posture could cause Mr. Moore's upper left chest, and thus, radio microphone, to contact the conveyor and become detached from his life vest. [Figure 15] Thus, a scenario in which Mr. Moore falls from a kneeling position after the post disconnects from the steel frame is consistent with the facts of the subject incident.



**Figure 13. 3D model illustrating Plaintiff kneeling on the fine sand conveyor.**



**Figure 14. 3D model illustrating Plaintiff kneeling on the fine sand conveyor and holding onto the chain for support.**

---

[15] Gordon, C.C., et al. (2014). 2012 Anthropometric Survey of U.S. Army Personnel: Methods and Summary Statistics. U.S. Army Natick Soldier Research, Development and Engineering Center: Natick, MA.







**Figure 15. (a)3D model illustrating Plaintiff's upper left chest moving in the vicinity of the edge of the conveyor after falling from a kneeling position. (b) Side view of fall from a kneeling position.**

Based on the facts known about the subject incident, Mr. Moore did not fall off of the fine sand conveyor from a standing position, but was more likely in a kneeling or crawling position. This is the scenario that agrees with the known facts of the case. In addition, the foregoing human factors analysis demonstrated that regardless of Mr. Moore's pre-fall position, he would not have fallen off of the fine sand conveyor if the post and chain located along the steel frame had not failed.

### Conclusions:

Based upon a reasonable degree of scientific certainty, and the information received to date, I conclude the following:

1. On July 10, 2017, at approximately 8:00 a.m., Mr. Jerry Moore, a 59-year-old man at the time, was injured when he fell from the fine sand conveyor located on the Dredge Pine Bluff to the deck below.

2. The stern-side post and chain handrail located on the steel frame of the fine sand conveyor failed when the post became disconnected from the steel frame, and thus there was a loss of support to the chain that ran up the top side of the conveyor.

3. Based on the materials reviewed, Mr. Moore would not have fallen from the fine sand conveyor to the deck below if the post and chain handrail on the steel frame of the fine conveyor had not failed.

Brian S. Katz, Esq.
December 15, 2021
Page 16



If you have any questions, require additional assistance, or if any additional information becomes available, please do not hesitate to call.

Sincerely,

*Angela Levitan*

Angela Levitan, Ph.D., CPE
Senior Biomechanist